ZION INDUSTRIES, INC., Plaintiff and Counterdefendant-Appellant, Cross-Appellee, *v.* ALFRED J. LOY *et al.*, d/b/a Arrow Moving and Storage Co., Defendants and Counterplaintiffs-Appellees, Cross-Appellants.

Second District (2nd Division)   No. 75-312

Opinion filed February 24, 1977.—Supplemental opinion filed upon denial of rehearing April 20, 1977.

Philip T. Powers and Burton X. Rosenberg, both of Rosenberg & Savner, of Chicago, for appellants.

Sullivan, Smith & Hauser, of Waukegan, for appellee.

Mr. PRESIDING JUSTICE RECHENMACHER delivered the opinion of the court:

Zion Industries brought an action for rent against Phillip J. Haymaker and Alfred J. Loy, doing business as Arrow Moving and Storage Co. Haymaker was dismissed as a defendant and the defendant hereinafter will be referred to as Loy. Loy counterclaimed, alleging damages incurred as a result of Zion's failure to perform a covenant to repair the roof of the leased building. Originally the trial court simply awarded Zion a judgment for the unpaid rent in the amount of $26,606.91, with nothing to Loy on his counterclaim. Loy then filed a motion to reconsider, as a result of which a new trial was ordered. At the second trial the previous

judgment for Zion was affirmed but Loy was awarded a judgment in the amount of $27,081 for damages, being $25,000 for loss of business caused by the leaking roof and $2,081 for damage to a customer's property, which the customer deducted from the amount he was charged by Loy for storage fees. Both sides appeal.

Zion contends they are not liable for damages because (1) a provision of the lease—paragraph 6—states they are not liable for water coming through the roof or walls and will not be liable for failure to keep the premises in repair; (2) while there is a covenant requiring the landlord to make any necessary repairs to the roof if written request is made to do so, no such written request was made; (3) there is no adequate evidence to support the damages awarded to Loy by the court.

Loy, on the other hand, maintains he has no liability for the rent because the failure of Zion to make proper repairs to the roof reduced his capacity to store his customers' goods by from one-third to two-thirds, this amounting to a constructive eviction and relieving him from the obligation to pay rent.

The evidence given at the trial indicated that Loy leased the premises (which had formerly been a candy factory) from Zion for three years from 1966 to 1969, then renewed the lease for two years, from February 1, 1969, through January 31, 1971. Late in 1970 or early in 1971, Loy approached Zion management and said he did not want to make a new lease for a definite term since he was not sure just how good his business would be in the coming year but he would like to remain under a month to month tenancy. Zion agreed and thereafter beginning with the expiration of the written lease on January 31, 1971, Loy occupied the premises at the same rental under a month to month tenancy.

The written lease which had expired on January 31, 1971, contained several provisions which must be considered in arriving at a decision in this case, since it has been considered by the parties and was held by the trial court that the provisions of the written lease applied to the oral month to month tenancy which followed it. Paragraph 6 of the written lease provided that the "[l]essor shall not be liable for any damage occasioned by failure to keep said premises in repair, nor * * * for any damage occasioned by water, snow or ice being upon or coming through the roof * * *." Paragraph 2, among other provisions, contained the following:

> "Upon receipt of written request from Lessee, the Lessor shall, during the term of this lease, make any and all necessary repairs to the roof and exterior walls of the premises demised herein * * *."

Loy testified that there had been minor leaks in the roof previous to 1972 but they were not serious. However, in March or April 1972, following thawing conditions, he began to notice numerous leaks in the

roof. He was not sure when he reported the leaks to Zion management but believed it was sometime after a rain storm in March or April 1972. No written request was given by him to have the roof repaired but Loy testified he telephoned either the owner, Mr. Wolfslagle, or the Zion maintenance man, Jim Meyers. He testified he also complained by telephone either to Mr. Meyers or to Mr. Wright, the Zion auditor, in May and in July of 1972 and thereafter he complained to Zion about the roof several times from August through October 1972. Loy testified that during July 1972 Zion attempted to make repairs to the roof with plastic roof cement but this repair did not stop the water from coming through the roof. Some further work was done in September 1972 but this too failed to keep the water out. According to Loy's testimony water came into the building every time it rained from March up to and including December 1972. By July 1972 he could use only 50% of the building and by December 1972 his useable space was reduced to one-third of the total floor space. At this time, in December 1972, Loy was some $21,000 in arrears in rent and was given a notice to quit the premises by Zion. He then began moving his merchandise out of the building and completed doing so in February 1973. At the time he quit the premises Loy owed some $23,000 in rent calculated on the original rental of $2700 per month, plus $60 per month for heat.

■■ As to Zion's contention that the obligation to repair the roof could be invoked only by a *written* request, whereas only telephone requests were made to Zion, we regard the acknowledgment of the oral request implied by sending men and materials to the building and attempting to repair the roof, as waiving the technicality of written notice. We find no merit to Zion's contention in this regard.

■■ Conceding then that oral notice of the condition of the roof was given and written request to repair was waived, we consider next the contention that the breach of this covenant dispensed the tenants' obligation to pay rent. The general rule in Illinois, as elsewhere, is that the obligation to pay the rent and the covenant to make repairs are separate and independent covenants and that the failure to make the promised repairs does not discharge the obligation to pay the rent. (*Peoria Housing Authority v. Sanders* (1973), 54 Ill. 2d 478; *Rubens v. Hill* (1904), 213 Ill. 523; *Lipkin v. Burnstine* (1958), 18 Ill. App. 2d 509; *Ing. v. Levy* (1975), 26 Ill. App. 3d 889.) However, it is equally well established that the obligation to pay rent *is* dispensed where the landlord evicts the tenant from the premises and even a partial eviction is sufficient to suspend the obligation of paying rent. *Goldberg v. Cosmopolitan National Bank* (1961), 33 Ill. App. 2d 83.

But as stated in that case:

"An eviction in the sense in which it is thus used must of course be

something of a serious and substantial character *done by the landlord with the intention of depriving the tenant of the enjoyment of the premises*." (Emphasis added.) 33 Ill. App. 2d 83, 86.

■■ Since it was admitted by Loy that Zion attempted to carry out its obligation to repair the roof, even though the repairs were ineffectual, it cannot be contended in this case that the landlord did anything with the intention of depriving the tenant of the enjoyment of the premises. Nevertheless, Loy argues, the failure to make adequate repairs amounted to a *constructive* eviction, since it allowed a condition to continue which eventually deprived Loy of the effective use and enjoyment of 50% or more of the leased space. Constructive eviction is, of course, recognized under some circumstances as tantamount to actual eviction. *Automobile Supply Co. v. Scene-In-Action Corp.* (1930), 340 Ill. 196. See also 49 Am. Jur. 2d *Landlord and Tenant* § 301 (1970).) However, as held in *Automobile Supply Co.*:

> "There can be no constructive eviction, however, without the vacating of the premises. Where a tenant fails to surrender possession after the landlord's commission of acts justifying the abandonment of the premises the liability for rent will continue so long as possession of the premises is continued." 340 Ill. 196, 201-02.

In this case, Loy remained in possession of the premises at all times.

Loy contends, however, that the modern rule is that where the landlord takes some action whereby the tenant is deprived of a portion of the premises, the tenant may treat such partial eviction as an eviction from the whole premises and be relieved of the obligation to pay any rent at all, even though he continues in possession of the remainder of the premises. *Goldberg v. Cosmopolitan National Bank* (1961), 33 Ill. App. 2d 83, is cited as authority sustaining this proposition. But an examination of that case discloses it has no relevance to the case at hand. *Goldberg* involved an actual eviction for a portion of the leased premises and in a separate case, an action of forcible detainer for the balance. It was not a case of constructive eviction for failure to perform agreed repairs as we are dealing with in the case before us. We have found no cases and none have been cited to us wherein the alleged eviction was not only partial and not only constructive rather than actual, but in addition, where the tenant remained in possession of the premises. In *Lipkin v. Burnstine*, cited by Loy, the claimed eviction was based on failure to furnish heat and the tenant moved out of the premises. In *Goldberg*, also cited by Loy, the eviction was actual, but even there the appellate court remanded the case to determine "whether the eviction was of a serious character and was done by lessor with the intention of depriving lessee of the enjoyment of

the premises demised." In view of Zion's attempt to make repairs to the roof it is obvious that there was no intent to deprive Loy of the enjoyment of the premises. In the *Goldberg* case there appears a quotation from Justice Cardozo's opinion in the case of *Fifth Avenue Building Co. v. Kernochan* (1917), 221 N.Y. 370, 372-73, 117 N.E. 579, 580, where he said:

> " 'Eviction as a defense to a claim for rent * * * suspends the obligation of payment either in whole or in part, because it involves a failure of the consideration for which rent is paid (citing cases). *We are dealing now with an eviction which is actual and not constructive.*' " (Emphasis supplied.) (33 Ill. App. 2d 83, 86-87.)

Since there was no actual eviction from the premises in the case before us the doctrine that rent is suspended in case of an actual partial eviction has no application here.

In any event, however, even if it were held that the circumstances in the case before us amounted to a constructive eviction we know of no case where rent has been held to be suspended as a result of a constructive eviction where the tenant continued to occupy the premises. See *Automobile Supply Co.*, cited above.

To the same effect is *Keating v. Springer* (1893), 146 Ill. 481; *Goldblatt Bros., Inc. v. Sixty-Third & Halsted Realty Co.* (1949), 338 Ill. App. 543; *Lipkin v. Burnstine* (1958), 18 Ill. App. 2d 509; *Gillette v. Anderson* (1972), 4 Ill. App. 3d 838. See also 49 Am. Jur. 2d *Landlord and Tenant* § 576 (1970).

So, although Loy is correct in asserting that actual eviction from a part of the premises suspends the obligation to pay rent, there was no actual eviction here and while, as Loy maintains, a constructive eviction may also suspend the obligation to pay rent where the tenant actually surrenders the premises, there was in this case neither an actual eviction nor a surrender of the premises and neither of the doctrines Loy invokes is applicable.

■■ The result, then, is that in this case the obligation to pay the agreed rent continued throughout Loy's occupancy of the premises and that part of the judgment holding Loy accountable for the rent must be affirmed.

This leaves unresolved Loy's counterclaim for damages he alleged he suffered as a result of the leaking of the roof based on loss of storage space and the ultimate loss of profits because no new business could be accepted. (Some actual loss due to spoilage by water is also claimed, but only in one case was there any evidence whatever adduced to prove this. The judge allowed this claim for $2,081 which was the amount charged back to Loy by Monsanto Chemical Company against their storage charges.)

The trial court awarded Loy $25,000 for "loss of business" and $2,081 for damage to Monsanto Chemical property. The only basis for this

judgment was the trial court's finding that Loy suffered a loss of gross revenue of $65,000[1] in 1972; that the reduction in gross sales "was caused by the condition of the building permitting water to enter and damage goods stored therein," and that "loss of gross sales is an indication of loss and an appropriate basis for the assessment of reasonable damages."

Zion contends (1) that under the holdover lease Loy is barred from recovering any damages whatever and (2) that if they are found to be liable for damages that the difference in gross revenues and/or gross business between 1971 and 1972 was not a proper basis for the assessment of said damages.

In *De Koven Drug Co. v. First National Bank* (1975), 27 Ill. App. 3d 798, the sole issue was the proper basis for the assessment of damages. The trial court awarded the plaintiff $5,000 in damages. The testimony of the defendant indicated a possible loss of somewhere between $500 and $3,120. The plaintiff's testimony, arrived at by a complicated formula, produced a difference in gross profits of some $28,000, between 1971 and 1972, due to unfair A & P competition, which the plaintiff contended was the proper basis for assessing its damages. On appeal the appellate court held that the factors influencing gross profits varied from year to year and the plaintiff's theory based on loss of gross profits was untenable. However, the court concluded that the detailed evidence adduced at trial indicated a rational basis for the trial court's finding of $5,000 in damages and they refused to disturb it.

■■ In the case before us had it been proper to allow damages for failure to perform the covenant to repair, based on loss of or damage to the counterplaintiff Loy's business, we would be inclined to accept the trial court's finding of damages on the basis of the rationale of *DeKoven*. In this connection, see also *Schatz v. Abbott Laboratories, Inc.* (1972), 51 Ill. 2d 143. Based on the testimony of Loy, which, although sketchy and unsubstantiated by any records, was uncontradicted, there was a rational basis for the court's award of $25,000 for loss of gross profits. However, in our opinion, while the amount of damages for loss of business might be rationalized simply on Loy's testimony of a difference of gross profits for 1971 versus gross profits for 1972, we do not believe the consequences of the failure to adequately perform the repairs to the roof were intended by the parties to extend this far. Paragraph 6 of the lease, which we feel, must be construed together with paragraph 2 (the obligation to repair the roof) is, we think, indicative of the intention as to damages for failure to make repairs to the premises. The pertinent part of this paragraph reads as follows:

"Lessor shall not be liable for any damage occasioned by failure to

---

[1] While the court order found that the gross revenue for 1971 was $142,000, the testimony appears to be that the gross revenue for 1971 was $144,000.

keep said premises in repair, nor any damage done or occasioned by * * * sprinkler, * * * pipes or sewerage, or * * * water, snow or ice being upon or coming through the roof, skylights, trap door or otherwise, * * *."

Loy contends that paragraph 6 cannot be invoked as a defense by Zion on this appeal because the provisions thereof were not pleaded or argued at the trial and to allow this paragraph to be used on appeal as a theory of defense would be violative of the well-established rule that theories or arguments not raised during trial cannot be set forth as points on appeal in this court.

■■ On the other hand, however, the entire lease, including paragraph 6 was introduced into evidence and accepted as the basis of Zion's claim for rent as well as the defendant's counterclaim for damages. Loy's claim for damages is obviously based on the lease and not on negligence. Apart from the lease there is no duty on the landlord to maintain the premises or repair the roof (*Ing v. Levy* (1975), 26 Ill. App. 3d 889), so the extent of such duty and the consequences of failure to perform it must be determined by reference to the lease. This is the agreement of the parties and we see no basis for isolating paragraph 2, which was the promise to repair the roof, and holding that paragraph 2 is the only agreement between the parties, when the action arose in the first place out of other covenants of the lease and the entire lease is an exhibit in the case.

An argument has been raised by Loy that the provisions of paragraph 6 of the lease amount to an exculpatory clause and cannot be invoked in this action filed in 1973 in view of the provisions of section 1 of "An Act making void and unenforceable certain agreements exempting lessors from liability * * *" (Ill. Rev. Stat. 1971, ch. 80, par. 91), reading as follows:

> "Every covenant, agreement or understanding in or in connection with or collateral to any lease of real property, exempting the lessor from liability for damages for injuries to person or property caused by or resulting from the negligence of the lessor, his agents, servants or employees, in the operation or maintenance of the demised premises or the real property containing the demised premises shall be deemed to be void as against public policy and wholly unenforceable."

■■ We do not regard the statute as applicable here. In the first place, the lease which contains the "exculpatory" clause was executed in 1966 and extended in 1969 through January 1971. The oral, month to month, lease was held by the court to have included the provisions of the former written lease and this oral lease commenced in February 1971. The lease was therefore in effect before the legislation cited above was enacted and if the tenant is going to invoke the provision of the lease with regard to

repair of the roof we see no reason why the provisions of paragraph 6 of the lease should not also apply. This is in accordance with the decision in *Bruno v. Gabhrauer* (1972), 9 Ill. App. 3d 345, 347, where the court said:

"However, that statute does not change the situation in regard to plaintiff's case as it was not in effect on May 1, 1968, when the lease was executed and, not having retroactive effect, it cannot be applied here to divest the lessor of the vested right to his defense."

In any event, we are doubtful that the statute quoted above is applicable to the situation before us. The counterclaim is based on a covenant and the damages alleged are as the result of the breach of that covenant. The action is not founded on negligence and nowhere, in paragraph 6 or in any other part of the lease, does the landlord attempt to excuse himself from injuries due to his negligence. The roof here was old and beyond satisfactory repair. The damage was done by water which entered in spite of the landlord's efforts to prevent it. The tenant was well aware of the defect in the roof when he agreed on the month to month tenancy and although not bound to remain in the premises after the first serious leakage, being on a month to month basis, he chose to do so for reasons of his own. This is not the kind of situation contemplated by the statute in question.

Therefore, it is proper and necessary to consider the entire lease in determining the damages to be assessed from a breach of the covenant to repair the roof, in order to discover what the parties may have contemplated in connection with damages. In *Sitnick v. Glazer* (1956), 11 Ill. App. 2d 462, 467, quoting from 23 C.J.S. *Damages* § 24 (1966), the court said:

" 'As a general rule * * * the damages to which one party to a contract is entitled because of a breach thereof by the other are such as arise naturally from the breach itself, or such as may reasonably be supposed to have been within the contemplation of the parties at the time of making the contract as a probable result of a breach thereof. * * *' "

See also 22 Am. Jur. 2d *Damages* § 56 (1965), and the annotation in 28 A.L.R. 2d 446, 487 (1953), which states:

"Tenants injured by failure of the landlord to repair are not confined to difference in rental value as their measure of damage, but may recover prospective profits which are pleaded and proved with reasonable accuracy and certainty to be a direct, but not remote, consequence of the breach, *and the loss of which was within the contemplation of the parties, at the time they made the contract,* as a probable result of its breach." (Emphasis added.)

■■ We are dealing here with a covenant under a lease rather than a contract, but under the authorities set forth above as well as plain logic, it

appears to us that where the lease specifically repudiates liability for damage for water coming through the roof, it cannot be said that the measure of liability for failure to repair the roof included loss of business or loss of customers or diminution in anticipated profits. Loy is entitled to the damages which necessarily and directly result from the failure to perform the covenant in question because, otherwise the covenant would be meaningless, but in view of the specific rejection of damages arising out of the failure to maintain the premises contained in the lease, we think the liability of the landlord should not be expanded to embrace remote and consequential damage such as loss of gross profits from a decline in the value of business transacted in 1971 as compared with the business transacted in 1972. It should be noted that Loy himself testified that 1971 was a "terrific" year, impliedly, therefore, it was better than normal.

■■ The award of $25,000 to Loy for loss of business appears to have been based entirely on Loy's unsupported testimony that his gross revenue was $144,000 in 1971 with labor costs of only $42,000 and that his gross revenue was $77,000 in 1972 with labor costs of $34,000. On this basis the trial court awarded $25,000 for loss of business but (1) there was no evidence to show that Loy actually turned down any new business from any source; (2) there is nothing to show that Loy's business would probably have continued at as high a volume in 1972 as in 1971 in the absence of the water damage. Loy's reason for not renewing the year to year lease when it expired in 1971 was that he was dubious about his prospects for the future. The business was apparently subject to considerable fluctuations, and the expected downturn in business may have occurred in 1972, instead of as expected in 1971. Moreover, Mr. Tokowitz, a supervisory employee of Zion at that time, testified that he called on Loy several times during December 1972 and January and February 1973 relative to the delinquent rent. He further testified that Loy told him in January and February that he had applied for a Small Business Administration loan and that if and when he received it he would pay the back rent in full. Tokowitz further testified that during these meetings Loy never made any complaint to him nor did he (Loy) refer in any way to the leaky roof. This would seem to indicate that the rent delinquency was due to failing business rather than to the leaky roof as was claimed by Mr. Loy at the trial; (3) neither is there any evidence to indicate when and to what extent the business loss was lost by reason of water rather than other business reasons. This is especially true as to Monsanto; (4) bearing in mind that the lease was on a month to month basis and that Loy could have quit the premises at any time on a month's notice and actually he did not quit until served with a notice to do so, the question arises to what extent, if any, did he waive damages by remaining in the premises; (5) with regard to the item of damages in the amount of $2,081 for damage to

Monsanto Chemical goods, the basis of this was a deduction by Monsanto from the storage fees they owed to Loy. While it is possible that there may have been some damages due Loy from Zion because of the Monsanto transaction, we feel that the arbitrary amount deducted by Monsanto from storage fees owed to Loy was not a proper measure of damages, if any, as between Loy and Zion.

On the other hand, there is a rule of damages for breach of the landlord's covenant to make repairs which is accepted under the Illinois cases and in many other jurisdictions and which appears to us to be just and logical under the circumstances of this particular case. Under that rule the tenant's damages are calculated on the difference between the rental value of the premises if kept in a condition of repair required by the landlord's covenant and the rental value in the condition in which they actually are. This rule is stated with approval in *Oppenheimer v. Szulerecki* (1921), 297 Ill. 81; *Loy v. Sparks* (1940), 304 Ill. App. 35; *Cromwell v. Allen* (1909), 151 Ill. App. 404; *Birtman v. Thompson* (1907), 136 Ill. App. 621. The annotation in 28 A.L.R. 2d 446, 481 (1953) states:

> "[T]he most usual rule for assessing the tenant's damages for breach of the landlord's covenant to repair, in the absence of special damages, is the difference between the rental value of the premises if kept in the condition of repair required by the landlord's covenant, and the rental value in the condition in which they actually are. [Citing numerous cases.]"

We think this is the measure of damages which should be adopted in this case.

While this opinion is already long we feel it is advisable to sum up what we regard as the practical realities as they were revealed by the testimony at trial, drawing such inferences therefrom as seem justified by reasoning and experience, in order to arrive at a reasonable and just result.

It is evident from the testimony that Zion's building was somewhat leaky (walls as well as the roof) long before any complaint was made by Loy and Loy was aware of this. It is also apparent that Loy was in some doubt at the end of 1970 as to the future prospects of his business which is why, when the formal two-year lease neared its termination in December 1970, he informed Zion that he wished to extend it only on a month to month basis. At that time, as Loy knew, Zion was also in financial difficulty and he could hardly have expected them to go to the enormous expense of supplying an entire new roof for a tenant who was so doubtful of his own prospects that he wished to be only a tenant from month to month. When the first serious leaks occurred, in March or April of 1972, any damage could not be said to be the result of Zion's negligence for at that time Zion had not been notified of any leaks and Loy had accepted the minor leaks without complaint. When Zion was notified they

attempted to repair the leaks but the leaks (as is often the case with a large, old roof) could not be repaired satisfactorily. Therefore Loy, though he was only a month to month tenant, remained in the building but paid no rent and applied for a SBA loan, which he informed Zion, when they pressed him for the rent, would be used in part to pay up the back rent he owed them. Loy continued to remain in the building without paying rent until in December 1972, when he was given notice to quit by Zion. He did not leave the premises until February of 1973. The cold hard truth seems to be that Zion had no incentive to replace the roof even if they had had the funds to do so and Loy had no funds to pay the rent, which he had no incentive to do because of the serious leakage. Both parties, therefore, continued in the status quo until Zion finally gave Loy notice to quit.

In short, neither party performed its obligations under the lease and each is in some measure in default to the other. The amount due to Zion, being measured by the stated rent, is easy to determine. The damages due to Loy for the breach of the covenant to repair the roof is less certain but, as suggested above, is also determinable with reference to the rental value of the premises—that is, the difference between the rental value if the covenant had been performed and the rental value under the conditions which actually existed. In arriving at this amount it should be borne in mind that the sum to be awarded to Loy is based on *damages*—not on a new or modified lease. Therefore, such amount may be subject to the rules of waiver or mitigation of damages as the case may warrant.

The judgment in favor of Zion Industries, Inc., in the amount of $26,606.91 is affirmed, and the judgment in favor of Loy in the amount of $27,081 on his counterclaim is reversed and remanded for further proceedings not inconsistent with this opinion.

Affirmed in part; reversed in part and remanded.

GUILD and SEIDENFELD, JJ., concur.

SUPPLEMENTAL OPINION UPON DENIAL OF REHEARING

Mr. PRESIDING JUSTICE RECHENMACHER delivered the opinion of the court:

The cross-appellant, Loy, has petitioned for a rehearing on the ground that this court's opinion erroneously treated his amended complaint as a counterclaim and thereby overlooked those aspects of his claim which were founded on negligence, willful and wanton conduct and fraud.

The petitioner is technically correct as to the form of the pleadings: it is true that the petitioner, after an adverse ruling in the first trial on his

counterclaim, filed a direct complaint in two counts—breach of covenant to repair and negligence—and later filed an amended complaint adding two more counts—willful and wanton conduct and fraud. Nevertheless, the trial court, in its judgment order of February 26, 1975, described Zion Industries as the "plaintiff," and Loy, the petitioner here, as the "defendant," and the order appealed from is that "Plaintiff—Counter-Defendant, Zion Industries, pay to Alfred J. Loy d/b/a Arrow Moving and Storage the sum of $474.09." In the motions to reconsider, which both parties filed separately, each styles the motion "Zion Industries, plaintiff, v. Alfred Loy, defendant." Likewise, the notice of appeal in each case (both parties appealed) designated Zion as the plaintiff and Loy as the defendant.

The question we must consider is not what the correct designation of the parties is, but whether there was a prejudicial failure to consider the counts of negligence, willful and wanton conduct and fraud, as set forth in Loy's complaint. This court, while neglecting to treat negligence as a separate count in the opinion, did not ignore the question of negligence. On page 10 of the opinion we said:

> "Loy's claim for damages is obviously based on the lease and not on negligence. Apart from the lease there is no duty on the landlord to maintain the premises or repair the roof (*Ing v. Levy* (1975), 26 Ill. App. 3d 889), so the extent of such duty and the consequences of failure to perform it must be determined by reference to the lease."

As further authority for the proposition that the landlord has no common law duty to repair the premises and is therefore not answerable in negligence for failure to do so, except in special cases, not applicable here, see *Elizondo v. Perez* (1976), 42 Ill. App. 3d 313; *McDaniel v. Silvernail* (1976), 37 Ill. App. 3d 884; *Forshey v. Johnston* (1971), 132 Ill. App. 2d 1106; *Moldenhauer v. Krynski* (1965), 62 Ill. App. 2d 382. See also 24 Ill. L. & Prac. *Landlord and Tenant* § 281 (1956), and 49 Am. Jur 2d *Landlord and Tenant* § 774 (1970).

■■ It is obvious that a count alleging negligent repair of a roof is based on a covenant to repair the roof in the first place. The allegation of negligent repair of the roof has relevance only insofar as there was a covenant to repair the roof. The breach of the duty does not give rise to an action in tort but only in contract for breach of the covenant. In other words, the repairing of the roof in a negligent manner might give rise to an action for breach of a covenant but since the obligation to repair the roof only arises out of the covenant the unsatisfactory repair cannot also at the same time be a tort giving rise to an action on the case. The petitioner's complaint as to an alleged failure to consider the negligence count has no merit since negligence is not a proper basis of recovery here.

The counts alleging willful and wanton conduct and fraud and deceit are not supported by any evidence in the record. The evidence clearly established that Zion made two efforts to repair a hopelessly worn-out roof, but without much result. Even if it were conceded that these repairs were made somewhat negligently (which the evidence does not establish), to charge Zion with willful and wanton conduct because the repairs did not succeed is completely unreasonable. Negligent work in repairing a roof is still negligence—it is not willful and wanton conduct. Mr. Loy's testimony disclosed nothing in Zion's conduct to sustain such an allegation.

As to fraud and deceit the basis for this count is certainly not to be found in the testimony of Loy and he was the only witness in his behalf. This count seems to have no basis whatsoever. Loy knew the condition of the premises when the lease in question was executed. The condition continued to worsen, according to Loy, but there was no deceit as Loy knew the condition of the roof better than anyone else. The written lease on which the covenant to repair is founded expired in 1971 and Loy renewed it on an oral, month-to-month tenancy. There was no testimony by anyone that Zion ever misled Loy as to the condition of the roof. Loy himself testified he had noticed leaks prior to February, 1971, when the oral lease began, but did not consider them serious. According to his testimony the first serious leaks occurred in March or April of 1972. The oral, month-to-month tenancy had already been in effect for over a year at that time, so obviously the leaks developed long after the inception of the month-to-month tenancy under which Loy invokes the covenant to repair the roof. At that time Loy, no doubt, knew the condition of the premises better than Zion did and if he was mistaken about the possibility of the leaks becoming worse, there is no evidence that Zion was responsible for this misjudgment.

Indeed, if there was any fraud and deceit in this situation it was the other way around: it appears from the testimony of Mr. Tokowitz, Zion's supervisor, that Zion was induced to forego the rent for a considerable period of time by promises of Loy made in late 1972 to pay all of the arrears as soon as he received an imminent Small Business Administration loan. Afterwards he completely repudiated his obligation to pay the rent.

As with the allegation of willful and wanton conduct, the testimony makes it evident that the count in fraud and deceit is not based on any facts and can be disregarded for purposes of this opinion.

We find no error of substance and hereby affirm our original opinion.

Judgment affirmed.

GUILD and SEIDENFELD, JJ., concur.